are all ordered to recede. 15 minutes to decide. Mr. Desmond, stand by. Good morning, Your Honors. Christopher Desmond on behalf of the Plaintiff Appellant, the Estate of Jeremy Rucinski. If the Court will, I'd like to reserve three minutes of rebuttal time, please. Your Honors, I have a couple distinct points that I want to talk about today, and I want to emphasize that these are distinct points in terms of our claim under federal law and our claim under state law. I'm going to begin with our claim under federal law, and if you look at the trial court's ruling, the trial court ruled that these defendants were entitled to qualified immunity. As the Court is aware, there's two different prongs to the qualified immunity analysis. Here, the Court limited its ruling to the first prong of the qualified immunity analysis. The Court found that it found that there was no genuine issue of material fact regarding whether or not the use of force in this case was excessive. The primary disagreement between ourselves and the trial court is that the trial court failed to view the evidence in the light most favorable to the plaintiff. Our contention is based on the fact that at the scene of this shooting, you have four different deputies in total who responded to this scene. I know the Court is very familiar with the facts, but this is a welfare check that these officers are engaged in. This isn't a suspected crime. No one's responding to any criminal activity. They're going to check on my client because of reports that he's schizophrenic and that he's potentially posing a harm to himself or a threat of harm to himself. So what's your point about that there were four deputies dispatched and this was only a welfare check? So there were four deputies dispatched on this welfare check, and of the four deputies that are dispatched, there's one deputy, Deputy McCann, who elects to use fatal force in this instance. Now there's case law throughout the Sixth Circuit that talks... That deputy wasn't being immediately threatened. That's the problem. You've got a problem because the shooter, a deputy, was apparently under the facts being immediately threatened with a knife a few feet or inches from the deputy, the fellow who got his knife out, and the deputy was fearful. And the problem is we've got this rule in the Sixth Circuit which may or may not be appropriate, but we've got it pretty clearly that we've got a segmented approach so that we can't go back and say that they should have gone about this in a better coordinated way so that this would not have occurred, that one deputy would be exposed to this possibility. That's the problem as I see it in the case that you've got to address why that's not the answer to the problem. And that's one reason, and we'll jump to this in a few minutes, but that's one reason why I wanted to emphasize there are distinct claims here. And I acknowledge the segmented approach has been, this has been the legal issue throughout the case. And Judge Batchelder, I know you were on the two opinions that address the segmented approach that have been at issue in this case, which are the Livermore and the Dickerson cases. And so looking back at Dickerson, which I believe Dickerson was the first case in which the Sixth Circuit adopted the segmented approach, there's interesting language in Dickerson. Dickerson is citing to a Seventh Circuit case that had adopted the segmented approach. And your panel cited to the Dickerson language where Dickerson explains that there are instances where we entrust police officers to cause trouble. And that's the phrase that's used in this case with the general notion that there are instances where police officers have to cause trouble by disrupting criminal situations. And when they do that, you don't necessarily know how a situation is going to devolve. What I would respectfully submit is that this instance where you're talking about police officers responding to a welfare check, where they've been asked to come to a scene to help somebody, and where they're given all the facts. They know this individual is schizophrenic. They know this individual is in a garage, that he allegedly has a knife, and that he poses a threat to himself and only himself at this point. Where they know those facts, I don't know, looking at Dickerson and looking at Livermore as well, I don't know whether those opinions represent that the segmented approach should be applied to this type of situation. I can't give you a case where this court has said it doesn't apply to this situation, but I also can't give you a segmented approach to a case quite like this one. Ordinarily, it's officers are responding to criminal conduct, they're trying to stop someone who's a known or suspected criminal, things devolve, things unravel, and deadly force gets used. There are circuits out there that have rejected the segmented approach, so to speak. I want to say there's three or four. I know the Ninth Circuit still doesn't... Split, and the Supreme Court hasn't recognized the split but hasn't done anything about it. Correct, and they very recently had an opportunity to do something about it in the Sheehan case, which is a case that came out of the Ninth Circuit. In the Sheehan opinion, which was a case that involved a mentally ill individual, the Supreme Court recognized the split. We've got to apply the Sixth Circuit law on this, and if we've got to, whether we may agree or disagree with it. So, it seems to me we've got to apply some form of a segmented approach, and this police officer was in an immediate situation of harm. I understand, Your Honor, and I understand that this court is bound by its precedent and has to follow its precedent. What I would say is that I haven't seen, again, the segmented approach applied to facts quite like this, and so I don't know if it is entirely clear when you look at the rationale of Dickerson. How would we distinguish it on the facts here? What would we say? The facts here would be that there isn't criminal conduct that spurred the police involvement in the situation, and so when the police are involving themselves in a situation for the very purpose of the well-being of an individual, they can't use... But I'm struggling with that a little bit, with the way you're painting it, because if it were solely the well-being of the individual, then the person who called them wouldn't have locked herself in the bathroom, would she? Well, Your Honor, there's dispute in the record regarding that point, and if you look at her deposition testimony, this is Ms. Vanderbrook, who was his live-in girlfriend of, I believe, seven years. She's the homeowner. She states that the reason why she's in the bathroom is because it's the one room in her house that gets cell phone reception and that she was limited to using her cell phone. She specifically said in her deposition testimony that if during the 911 call she said she was locked in the bathroom, that that was a misstatement and it was not true. But more importantly than that... Did the police know that? I don't believe they did, and I've looked through the record for this point. The police officers are given their information, not from that 911 operator, but from the dispatch officer. The dispatch officer, according to these defendants' testimony, they were told that he's in the garage, that he has a knife, and that the woman who called suspects that he's a threat to himself. I didn't see, and defense counsel can correct me if I'm wrong, I didn't see any information that was given to the officers that would have made the officers think that someone else is being threatened here. And Ms. Vanderbrook was very clear that she had called the police in years past because of other similar situations, but she said she had never personally been threatened by him, that there had been no violence between them, and that she did not feel threatened that particular day. Why did he pull out the chutzpah on her when she refused at first to tell him where his cigarettes were? Well, there's an interesting exchange in her deposition, and I believe the sort of debate was over the word brandishing, where she was asked, did he brandish the weapon at you? And she said, he pulled out the knife and showed me the knife. She specifically says, though, I did not feel threatened by the knife, I didn't feel as if he was threatening me, but she does use the word scared. And the way that I took her deposition testimony, and I guess there could be room for interpretation, which would be a factual issue, is that she was scared over the prospect of a knife being in his possession because of what he could have done to himself. You cited the Sheehan case, which was last year's Supreme Court decision. How do you deal with the language, and I say the plaintiff's quote, cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided? Is that the situation we're dealing with here? In a way, it is the situation we're dealing with here. I believe Sheehan was postured a little bit as an equal protection case or an American with Disabilities Act case. It was about a Fourth Amendment violation. Right. They do talk about a Fourth Amendment violation. And I think that there was a discrepancy in terms of factually whether there was criminal conduct involved in what happened. I also think the discrepancy we have or the difference we have with Sheehan is that we don't have multiple officers at the scene making a conscious choice about different levels of force that are required. We have Sixth Circuit precedent. Judge Merritt, you were on the panel, I believe, in Miller v. Sanilac County that talks generally about the idea that under Graham v. Conner, you have a right to be free from the use of gratuitous violence. I had a case here last year, an excessive force case that I prevailed on, Greco v. Livingston County, in which Judge Sutton wrote the opinion noting that you have the right to be free from disproportionate use of violence or disproportionate force. So what I would submit is that where you have multiple officers using different levels of force, and we have plenty of cases in the past, by the way, where partners use fatal force to protect their own partners. So it's not that you only have a right to use lethal force if you're threatened. So these officers saw someone being threatened with some type of force, allegedly, and they chose to use tasers or use no force at all. I would submit that that presents, at a minimum, a question for a jury about what level of force was necessary. But I see my time as... threatened. This officer was being immediately threatened by a switchblade, an apparently substantial knife pointed right at him, very close to him. So it was a four-inch blade. She was the farthest officer from my client at the time she walked into the garage. He turned toward her within five or six seconds and begins to walk toward her. What I would say is that... Close to her, right? He got within, I believe, the estimate was six to eight feet, I believe, when the shot occurred. Oh, it was five feet. Okay. My understanding was that she had made it five feet out of the garage. She had backed up approximately five feet, but I thought that the estimate was six to eight feet. I could be... It could be five feet, Your Honor. I could be mistaken. She tried to back up. She states that she tried to back up. Didn't have much further she could go without being in a more vulnerable position. That is how she described it. Now... You may be right that the officers should have had some plan as to how to deal with it where this kind of confrontation would not occur, but that's just not in line with the Sixth Circuit case law. What it is in line with, though, Your Honor, is a Michigan claim for gross negligence, which is a distinct claim. And what I would submit to the panel, and I'd encourage the panel, I think the most jurisprudentially significant thing that has occurred while this case has been litigated and pending is the Beals v. State of Michigan opinion that came out from the Michigan Supreme Court case. This is a case that's described in depth in my brief, but an autistic child drowned at a state owned pool in Michigan because a lifeguard was not on duty and not paying attention. The Michigan Supreme Court said that the proximate cause of the drowning death was not the lifeguard failing to respond. It was whatever caused the autistic individual to be under the water. So what I would say here is that, Judge Batchelder, I see you're frowning, and I hope it's for the same reasons I would frown about that opinion. But, Judge Batchelder, your opinion in Livermore, there was a state law claim for gross negligence in which your panel said that the proximate cause of the death was the individual who was engaged in criminal conduct. Well, if the State of Michigan is going to go to the lengths of interpreting the term the proximate cause as literally as they did in Beals, I don't see how the proximate cause could be anything in this case other than the officer firing a bullet at my client. Yeah, but your Michigan case, does that disfavor transforming claims involving elements of intentional torts into claims of gross negligence? Yeah, there's certainly case law along that line, Your Honor. I know my time is up, but just to answer your question, I think that that case law applies more to instances, and I've seen this happen, where plaintiffs plead claims as this is assault and battery and or gross negligence, or this is a constitutional violation and or gross negligence for the exact same conduct. What we're saying here is the force should not, the fatal force should not have been used and was not necessary. But it was intentionally done here. The force was intentionally done. The gun was not fired accidentally. That's correct. And that's not what I'm trying to argue when I say that there's a gross negligence claim. When I say there's a gross negligence claim, I'm saying that under general principles of negligence, that you are liable for the reasonably foreseeable natural consequences of your negligence. In this instance, where you have an individual who's mentally ill, who you startle, who you he's going to move with that knife, and then you're going to feel like you have no choice but to shoot him. And so I don't think this is a situation where I'm just trying to play semantics and convert intentionality into negligence. I think there are two different aspects of this case. I understand that there could be limitations from a federal standpoint, as much as I disagree with them. But from a state law standpoint, it's a distinct claim, and I don't think we're subject to those same limitations. Thank you, Your Honors. Good morning, Your Honors. Rick Patterson, appearing on behalf of the defendants. Your Honors, appear to understand, obviously, that the segmented approach applies here. And I would just point out that, in my view, the Sheehan case last year, the Supreme Court endorsed the segmented approach. Because in that case, they dealt with officers, multiple officers, responding to the scene of a mentally impaired person who was, they were brought there to commit the person, not for any criminal behavior. So they were in the same situation as the officers were here. The officers entered the room. They were threatened with a knife. They retreated. Then they reentered the room, weapons drawn. One officer pepper sprayed the individual, didn't stop them, and then the individual was shot. This court, in viewing this, looked just at that second entry into the room. And they determined... It reversed the Ninth Circuit, which had gone the other way. Correct. They found that officers entering the room the second time with weapons drawn, when they're threatened with a person approaching with a knife, lethal force was justified. You know, when you read the Supreme Court jurisprudence on qualified immunity in these kind of cases, it's not all that clear what the rules are about qualified immunity. It's kind of all over the place. But I agree with you that that appears to be the case in that San Francisco case. But the problem the plaintiff's got here is the Sixth Circuit case law. It's got the segmented approach. And that's what we apply. And so the other point I'd like to make as far as the federal claims go, because plaintiff's counsel was arguing that, you know, the officers chose different amounts of force. One selected a taser, one had a weapon. The case law is clear, and it's the Great House case, that when a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death. And your Honor, Judge Gilman, you had it correct when you said the plaintiff in their appellate brief admits that the individual got within five feet, holding a knife, extended, directed at an officer with no barrier between them at the time she pulled the trigger. Under any jurisprudence, that justifies the use of deadly force, and it cannot be seen as excessive force in this case or in any other case based on the law as it's been established. I don't think there's much question as far as any of the federal claims go in that regard, and plaintiff's counsel seems to understand the limitations he's faced with based on the law as it exists. With regards to the state law claims, I'd like to address those because the plaintiffs attempt to be... He's saying he's not trying to play semantics with different types of claims, but that's exactly what he's doing. It's clear that the shooting was an intentional act. They've alleged an assault and battery, an intentional tort. The law in Michigan is pretty clear that an officer is allowed to use force, including deadly force, if they are threatened, and it's an objectively reasonable act to take. And subduing a threat. And that's what the officers did here. And there really wasn't a whole lot of argument on the assault and battery claim that counsel raised. He focused more on the gross negligence. And from the gross negligence perspective, and Judge Gilman, you correctly pointed out, Michigan cases have said you can't convert an intentional tort into a gross negligence count. And clearly, again, the act of shooting here was an intentional act. There's no mistake about it. The plaintiff's counsel takes a step back and says, well, that's not the act I'm talking about. I'm talking about the acts before that, that led to the situation where the shooting, that brought about the shooting. And it's my allegation that those are the acts that were grossly negligent. The problem with that position is the law in Michigan requires that the gross negligence be the one most immediate proximate cause of the injury. There's no question. And counsel basically says the one most immediate cause of this injury is the shooting, not the events that led to the shooting. In Michigan law, there can't be multiple causes. But there's only got to be one cause? In a state law, gross negligence claim to avoid governmental immunity, yes. The statute says that it has to be the proximate cause. The Michigan Supreme Court in Robinson defined the proximate cause as the one most immediate cause of death. Now, counsel mentioned the Beals case. And there, it was clearly the lifeguard had left the pool. The autistic child got into the pool, was unable to swim, submerged, and stayed underwater. So in looking at those sequence of events, the Michigan court said it wasn't the lifeguard leaving their post that was the one most immediate cause of this individual's death. It was the fact that they couldn't swim and they submerged underwater. Whatever caused them to stay underwater was the one most immediate cause. Analogizing it to this case, you have whatever events, however much blame they want to place on not having a tactical plan for entry into the garage. All of those events occurred prior to this individual approaching the deputy, knife drawn at her chest level, within five feet of her, at the time that she chose to pull her trigger in an intentional act. And that would be the proximate cause here. So he cannot go backwards in time to try to come up with a gross negligence count and still make the claim that it's the proximate cause. It did strike me that it wasn't obvious at the point where they entered the garage, I mean, now you had all four of them, that this was going to be the sequence that was going to play out. I mean, he might have just cowered in the corner. Truly, and obviously they had no idea how he was going to react. And, you know, they were there, officers entered the house with permission, they went into the garage, they opened the garage door to allow access for the other deputies. They each kind of took a position in the garage. And the one deputy with a direct, you know, pathway to the individual is the one who stayed outside, on the edge or outside the garage. Because looking back on it with the knife and all that and the woman who called, you would think they might have conferred a little bit and said before they were in any proximate, you know, whether away from this fellow, let him know that he had to get rid of his knife or put it down or something, so they wouldn't be at risk of harm. Well, they clearly instructed him repeatedly upon entering the garage to drop the knife, drop the knife, drop the knife. There's no question that that was part of their instructions, that he disregarded those instructions when he turned and walked towards the deputy who eventually shot him. There's no question that they didn't just walk in there and say, you know, they walked in there, they called his name, they got his attention, and then there's a dispute on whether or not he said anything, but it's kind of really irrelevant whether he did, because they told him to drop the knife. He disregarded that. So I would submit that regardless of whatever tactical plan they came up with, they did not know how he was going to react, and based on the way he did in fact react, there's nothing to indicate that he would have not... How much time did he have to react? Well, he was the one who approached the deputy. I mean, they called his name, he's in the corner of a garage, and he's standing there, he sees the deputies, he's the one who pulls the knife out and starts to walk towards the deputy. And she had attempted to move backwards? I apologize. Yes, she remained on the outside of the garage, and as he approached her, she backed up, but there was a snow drift or snow pile behind her, so she backed up as far as she could, and at that point in time, he was essentially on the edge of the garage, still knife out and continued to approach her. So the threat is there, the threat is real, the threat justified the use of deadly force here. It cannot be considered excessive in any way under Sixth Circuit precedent or Supreme Court precedent. And from a state law perspective, the same circumstances support the use of force to defeat any intentional tort or assault and battery claim, and plaintiffs attempt to swirl this into some type of gross negligence account based on events that occurred prior to the shooting itself fail because none of those events were the one most immediate proximate cause. This shooting. If your honors have any questions, thank you very much. Thank you, counsel. Thank you again, your honors. Judge Merritt, just one point I'm a little concerned about is I want to make sure that this doesn't somehow lead to an opinion in which this circuit says that Sheehan has now settled at a national scale, whether or not the segmented approach has been approved of or not. And for that point, I direct the panel to footnote four from Sheehan in which after citing to the Ninth Circuit's approach towards what you can consider and can't consider, they say our citation to Ninth Circuit cases should not be read to suggest our agreement or for that matter, disagreement with them. And then they basically say, see also Livermore. And so they lay out that different circuits approach this differently. And at least based on this footnote, it seems to me to indicate that we're not taking a position on this matter because we don't need to for purposes of resolving this particular case. They're approving the Livermore approach as well as others. I mean, they're not ruling on that. And that's one of the problems with qualified immunity is unclear with the Supreme Court hadn't come down very clearly on what it amounts to. You're right, your honor. And that's why I'd say that in general, and this is the argument that I always end up making in qualified immunity cases, is I'm not the one who moved for summary judgment. I'm not the one who's saying as a matter of law, it's crystal clear here that they're liable. What I'm saying is that this needs to be submitted to a jury. And when you go back to, you know, some of the clearest Supreme Court precedent we have on this subject, you know, Graham v. Connor, you look at something like Graham v. Connor, what it makes very clear is that, look, this is a totality of the circumstances analysis. You have to put all of these facts in front of whoever it is that's making the determination. The Supreme Court has said, and I guess it's plausible, that qualified immunity is designed to avoid a trial. That's correct. But this panel or this court has also said, and Judge Batchelder, you were on the panel, in the Baker v. Union Township case, which was an opinion, I believe, authored by Judge Boggs, where he said that in a qualified immunity case, when the parties start arguing facts and making factual arguments, a court is divested of jurisdiction to make those types of determinations. I mean, we don't have much dispute of the material facts here, do we? I guess you're mainly fussing about whether it was reasonable for the officer to do what it is. You know, well, I'm glad you asked that, Judge, because one thing that I did want to make sure it was addressed in this rebuttal is, you know, this idea that while the officers come in,  and he decides to charge. I think that we're losing some sense of what this situation actually was. Two officers, this is a garage that's attached to a home, so there's a pedestrian door, if you will, that leads from the home to the garage, and then the vehicle door, the large garage door. Two officers go into the home. Jeremy has no idea any police officers are at the home or that he's about to be encountered, and he's going through a schizophrenic episode. One officer reaches through the pedestrian door, triggers the overhead vehicular garage door. So now, Jeremy is in the garage, going through a schizophrenic episode, has loud music playing. All of a sudden, he hears the motor of a garage door opening, and over all that chaos, he looks up, sees two people behind him, one with a taser, looks in the other direction, and sees two people coming towards him, one with a taser and one with a pistol drawn. This all occurs within five seconds. Within five seconds of the first officer triggering the garage door, Jeremy is dead. Basically saying they should have had a better plan. They absolutely should have, and I know that goes back to the segmented approach, but when you look at what these officers did, the fact that they did not have any discussion with one another prior to engaging with my client, and that the shooting officer in this case admits that she turned off her radio. That was one of the first things she does when she gets to the scene. Counsel, you'll see that your red light has... All right, thank you, Your Honor. I appreciate the opportunity. Thank you very much. The case will be submitted. Clerk may call the next case.